Good morning, your honors, David Pritchard to the Iaccino family of fellows. The first issue I'd like to address is the testimony of Dr. Franciosi. It's a Rule 213 objection. There's lots of Rule 213 cases, and I would like to make it clear from the very start, this is not a typical Rule 213 case where we scour the record to see if the expert gave the opinion in his or her deposition transcript. This is an error involving surprise, involving prejudice, involving gamesmanship. I take it you're all familiar, so I'm not going to go into the fact that the placenta showed two problems, infection and these things called other changes, different parts of the placenta that was dying and was already dead. The infection was the defendant's theory of causation. In other words, cytokines got to the brain from infection, the baby was brain damaged before the malpractice took place. The other changes had nothing to do with infection. That's undisputed. So I'd like to go through why this is surprise, why this is prejudice, why this is gamesmanship. All the defendants filed Rule 213 disclosures. The hospital, who you know later settled on in the case, named Dr. Franciosi with no causation opinion. I am well aware that you don't have to have every opinion in the disclosure. You can have it in your deposition. It is a factor among about ten of them that you can consider as to whether we were surprised. Could you please allow me to interrupt you to apprise everyone that we did grant the motion to cite additional reports? Then we took the deposition of Dr. Franciosi and eight separate things occurred at that deposition which are significant. It started out nice and routine, what's your background, what did you read, and we get to the first causation question and the lawyer submitting him stops us and says he's not here, he's not being offered to give causation opinions. And then the second thing happened, the doctor agreed on the record. And then the third thing happened, which is really significant, we moved on. We didn't ask causation questions on that. The deposition went on and mostly it dealt with what do you see on the slides, what does it show, what does the placenta show. From time to time it would drift into a causation question. And every time that happened, both the lawyer presenting him and the doctor would say he's not here to give quote unquote medical opinions, I'm not here to give quote unquote medical opinions, and what happened, we moved on. So we don't have a discovery deposition challenging any causation opinions that he might have. Then we disclosed our rebuttal experts. There were a number of rebuttal experts. One of them was Dr. Kauffman, a pathologist. Now, in their brief they say well you weren't surprised, you disclosed Kauffman to refute these causation opinions. No, read Kauffman's deposition. He doesn't give opinions that any of this did or did not cause brain damage. I actually skipped over another factor that occurred prior to this. Franciose is a pathologist. He doesn't treat live patients. He's not a neonatologist, he's not a maternal fetal medicine doctor. It's not even logical for us to be thinking that he's going to give an opinion that there was fetal brain damage due to something. What else occurred in that deposition? We found out that he was sent the medical charts but didn't read them. Not too surprising because all he's supposed to be talking about is the pathology report. Later we know he's going to give this opinion on infection, but he doesn't know any of the facts as to whether there was any clinical infection. At trial he ends up giving this opinion that well of course cytokines can cause this because it's a premature baby. Well, Jonathan wasn't even premature. So we're taking this deposition where we're told emphatically that he's not giving causation opinions. We're told it doesn't make sense that he's giving causation opinions and he doesn't even have information to give causation opinions. Then the hospital settles out of the case. We go to the first trial. We are told at the first trial that they're not going to call any of the hospital experts, including Dr. Franciose, and they don't. Now that case got mistried. It was an elderly judge who retired right after that which had nothing to do with anything in front of here. We go to the second trial. Now they tell us we are going to call Dr. Franciose and he's going to be testifying to this. We're like whoa, wait a minute. Motion eliminated. He's not giving causation opinions. So we have a hearing in front of Judge McCollum who says well, you better voir dire him first, Mr. Defense Counsel, before you start this evidence deposition because yes, you're able to tease out, you're able to torture out a couple of statements from this discovery deposition where it seems like it is a causation opinion but that's the best you can do. All this other stuff is sitting there. So we go up to Milwaukee to take his video evidence deposition. Pardon me for using a slang word, but the defendants blow off the court's order to take voir dire and proceed right directly with the evidence deposition. So when it's my turn to cross that video, I stop. I do the voir dire that the defendants were ordered to do and what do we learn? We learn that he still doesn't know the record, still hasn't read the facts, and he says, and it's cited in their brief, yes, this is a change in my earlier opinion. So why did the judge let it in? He let it in because if you go through this 149-page transcript, you can tease out a couple of sentences that sound like a causation opinion and they're cited in the defendants' briefs, they're the only thing in there that's in the brief, and all these other factors are just ignored. This is not the way to conduct trials. This is surprise, this is gamesmanship, this is prejudice. When he finally testified, it was on video, the little 8-by-11 photos he had of the dead placental tissue and the infarcts and all the other changes are now five-foot-high color blow-ups in front of the jury. So all they've got is a television set with this guy for three hours and they've got these giant color blow-ups of dead tissue surrounding them going on and on about how this placenta has all these problems. So it's pretty easy to figure out how a jury could get confused on this. Mr. Pritchett, before your time has expired, could you address your third issue? I'm interested in the argument that the trial court erred by allowing the defendants to cross-examine an impeached plaintiff's expert witness with a written medical report. Okay. First of all, contrary to what the defendants say in their brief, I fully understand, you don't have to have buzzwords of authoritative, I fully understand another expert can put in the medical literature, I get that. But there's no doubt that you have to put in the foundation. Look at your own case, Bowman, look at any Supreme Court case, you've still got to put the foundation in somewhere. It just wasn't put in. It's a huge record. But we've got word indexes. There's four articles, Wu, Redline, Nelson, Depp. Go to the word index, look up Wu, look up Redline, look up Nelson. You're not going to find anything. The fourth one, which was the compendium that Dr. Depp was an author of, they say that Dr. Depp put that in. Well, go to his deposition, volume 8, page 1986 at 48. Doctor, do you hold any publication as authoritative? Answer, no. The only reason that came up in Dr. Depp's deposition is we were going through his qualifications and he told us that it was a paper that he had written. I would like to address... I think the question was directed to the impeachment with a 6-2-2 affidavit. Oh, I thought it was medical literature. Okay, I'll go to 6-2-2. This is a really interesting case. I mean, I'm sure it's interesting for you too. Everything else is pretty routine. It's a first impression. But what do we have? We've got some help from the Supreme Court, we've got common sense, and we've got a sense of fair play. All three of the Supreme Court cases, De Luna, McAllister, Sullivan, talk about a 2-6-2-2 being a threshold opinion, a constituting or an advisory opinion. And even Judge Clark, who wrote the dissent, which had to do with whether it was constitutional or not, goes out of his way to say, obviously, even the majority agrees this is a procedural requirement, which by definition does not involve questions concerning substantive merits of the case. Now, what happened on this? Dr. Blake, in this 2-6-2-2, described decelerations as variable. Then at trial, he described them as either late, or they could be variable with late components. And they took the 2-6-2-2, again, multiple pages, blown up five high, with masking tape covering the stuff that the court didn't want them to see, which all of you who have been trial lawyers know that's catnip to a cat. Every juror's looking out like this, trying to read what else is on the thing, and it's unfair. They wanted to impeach by admission. At least he didn't allow that. They wanted to say, we didn't have everything in there. And then, what did they do? They went ahead and impeached by admission anyhow. And Judge Locallo, what he calls stray-horning them, where he, some judge at 26 and Cal, where he makes the objection himself, drags them out and tells them not to do that. But what is the problem with that? He drafted this 2-6-2-2 six years before this trial. I wasn't the lawyer. I didn't hire him. We don't have the cover letters that were sent to him. We know he looked at the strip, but as you know from our other issues, the strip is hard to read. So at most, he had a photocopy of a photocopy of a bad strip. If the foundation for the document was laid, then for what reason could it not be used for this purpose of impeachment? Because it has to do with a sense of fair play. These doctors are not, it's not what it purports to be. Don't you see a distinction between impeaching them with a prior inconsistent statement relating to a palpable fact as compared to impeaching them with a prior inconsistent statement containing an opinion that may have changed based on new facts that were developed over the case? Either the strip says something or it doesn't say something. He said it said one thing when he gave the 6-2-2 affidavit, and then in the trial he said it said something else. Now, he's looking at the same strip, isn't he? He's looking at the same strip, but it's just part of a preliminary opinion where he's saying that I think there's enough to go ahead here. I don't dispute that, but the question becomes, I take it in trial, he was asked what does the strip say? And he said it said something, and they impeached him and said, but six years ago he said it said something else. So what's wrong with that? I mean, that's a prior inconsistent statement of a fact. The problem is if you open the door to allowing impeachment by 2-6-2-2, trials will degenerate into cross-examination by 2-6-2-2. Only if you allow impeachment by omission, and no one's suggesting that that should be allowed. Well, let me read something that the defendants have in their brief. It says, Plaintiff has overlooked the fact that 2-6-2-2 does not prescribe the form that a written report must take, and there is nothing to prevent the author from such a report from qualifying his opinions to make clear that they are preliminary and subject to amendments. In other words, if he would have done that, it would have been okay. Is that really what we want everybody to do? I'll tell you, that's what I'm doing now with my 2-6-2-2. And that may be true if what you're talking about is an opinion, not if what you're talking about is a fact. Now, the question becomes, was he impeached with a fact or an opinion? He was impeached with an opinion. What was the opinion? The opinion was, were the decelerations variable, or were they variable with a late component? Based on what? Reading the script. And you read the same script. So is it an opinion, really, or is it actually a fact? We don't know that. That shows this, and no, it doesn't show that. Well, of course it's an opinion, because they all said it didn't show late decelerations. And we don't know that he looked at the same script. We don't know what was sent to him. We don't know how legible it was six years ago. We know that the one we had at trial was pretty much illegible. At best, the lawyer that hired him would have had a photocopy of that. He would have photocopied that to send it out there. But that really goes to the weight. You know, that's something that you would argue. Well, I can tell by your questions that this is not a strong point for me, so I'd rather use my time to talk about Nurse Hibbs, which I think is an extremely important point. But we think it's important. I'll answer any questions you want. I agree that it's impeachment by a prior inconsistent opinion, not a fact, by an opinion. And I don't think you ought to be able to do that, because where do you draw the line? It's easy maybe to draw the line on omissions. It's not so easy. He reads the records real quickly, and he says Nurse Smith was the one that misread it, and we find out at trial it was Nurse James. After we take the deposition of Dr. Smith, we find out that even though he signed that progress note, it was really in the handwriting of a resident. It's dangerous to take preliminary opinions and use them for impeachment of an opinion later on, when the court says the only reason you have this opinion is a preliminary one, just to get it through its pleading requirement is the way to describe it. We'll give you a few minutes to conclude. Thank you. Nurse Hibbs. This was very powerful testimony. As you know, because we were just talking about it, one of the issues was does the script show fetal intolerance to labor? Here we have a nurse, not just a nurse, the head nurse in charge of all labor and delivery, yes, they're correct, she wasn't assigned to the patient, she didn't read the script at the time, but she's the one that came in and signed the occurrence report. We take her deposition, and she says this script shows fetal intolerance to labor, and it's barred. Why is it barred? Because the trial court thinks it's a Sullivan opinion. It's not a Sullivan opinion. There is a shared competence between a nurse and a doctor. There is no dispute, even by the trial court, that she was capable of giving this opinion. Let me give you an example of a case where there's a fever in a child, and they're saying that the doctor should have given aspirin to bring down the fever. Are you going to be able to bring that nurse in to say, yes, I read the thermometer and the temperature was 102.1, yes, I put my hand on the head and the baby was perspiring, yes, this baby had a fever? Of course you're going to be able to say that. And this nurse is entitled to say, yes, I saw this on the script, yes, this is fetal intolerance to labor. She is not entitled to say the doctor should have given aspirin, the doctor should have done a C-section, and we know she wasn't going to do that because it's an evidence deposition, so we know exactly what was going in. Just a couple more. It was the same type thing. Okay. All over the brief by the defendants, they say, we didn't object, we didn't object, and they put in things like preliminary, the judge said it's preliminary, the judge is this. If you just read the next paragraph on all those sites, you will see that there were objections, and that I am confident of. Now. On Gibbs, what's your response to the argument you made in the offer of proof? Well, there was an offer of proof. It was a continuous offer of proof. It was an evidence deposition. The judge knew exactly what the nurse was going to say. The judge conceded that she was competent to give that opinion. He just said it was a standard of care opinion, which it's not. So it's a simultaneous offer of proof. Every single thing she was going to say was before the court, and he agreed it was competent. The only other thing I have, and I won't go into it unless the court wants me to, is this two-issue rule, which I just got, and I was up until one in the morning reading about it last night. I have a couple of comments, but I cannot go into that if you want me to. Your time has expired. How many people have been arguing? Your Honor, we expect to have two of the attorneys for the defendants argue. What we have decided, with the court's permission, is that I will address the Franciosi and the literature issues related to causation, and Mr. Horstman will address the 2622 and the nursing issues. Okay, so each of you will have ten minutes. That's what I would anticipate, unless the court has questions. Good morning, Your Honors. Karen DeGrand on behalf of the defendant, Dr. Linda Gibson. May it please the court. I will take my cue in beginning from the court's decision in Tabe v. Ossman, which is to ask at the outset, can the jury's verdict be explained by a finding of no negligence? And I think the answer on this record is yes, and if that is the case, given the general verdict, given the absence of any special interrogatories, there's no need for the court to dwell on the causation-related issues. There are a number of decisions from this court, Tabe, Davis, Robinson, Kirklis, all make clear that rulings confined to causation cannot be the basis for reversal in the absence of special interrogatories. Here, there's a general verdict after a long, hard-fought trial. Much of the effort of the attorneys and the experts was devoted to addressing the issues of negligence. There's no question about that on this record. The two-issue rule, as it's been articulated by this court, is not limited, as the plaintiffs argue in their reply brief, to cases where jury instructions are being challenged in the appellate court. An example of that is the Foley decision that actually addressed a Rule 213 issue, and we've cited it in our brief. And in that case, the court specifically found that evidence that had been admitted, the plaintiff contended erroneously, couldn't have affected the outcome of the case because it only pertained to one of four issues that the plaintiff was raising. The Davis case is another case where this court said that a threshold factual issue that could be resolved had to lead the court to affirm regardless of unrelated causation evidence. Again, not an instruction issue. I'd also just briefly emphasize the deferential standard of review here that applies to all of the issues that the plaintiff raised. I would submit that the court could begin even by looking at the hearing on the post-trial motion and work backwards to see what a conscientious, hard-working trial judge was looking at every issue in this case. I think, honestly, the court would be hard-pressed to find a trial judge who worked harder to understand the medical negligence issues, to understand the medical issues on all of the testimony, to listen and rehear arguments, and that was clearly aware of the jury's reaction. This court may find a ruling that it disagrees with, but I don't think a ruling that could meet the standard that no reasonable judge would have reached the decisions that our trial judge reached. On Rule 213, was Dr. Franciosi's discovery deposition perfect? No, it wasn't perfect. But did he give causation opinions? He most certainly did, and we've laid them out for the court in our brief. Dr. Franciosi... What do you do with a discovery deposition where the deponent gives causation opinions, but the attorney offering the deponent turns around and says, but he will not testify to a causation opinion trial? What do you do with it? I think that what has to be done, Your Honor, is to look at the record and look at the opinions that the witness gave, and it was clear that he was testifying to causation opinions, and at the outset of the deposition, and this was taken by plaintiff's counsel, an understanding was raised that all opinions that were given would be given to a reasonable degree of medical certainty. But it is also true that counsel and the deponent both said he would not offer causation opinions at trial. Well, I think that's the hospital's attorney made that statement that the deposition opinions were limited to some extent, but the testimony itself did encompass causation opinions. Isn't that kind of like checking a race on a card game? You get in real trouble when you do that. I don't think so, Your Honor, and I think the best proof of that is Dr. Coffman's testimony. To put this in perspective, this deposition went ahead in October of 2003. Long before the first trial, the plaintiff's attorney disclosed Dr. Coffman for the specific purpose of rebutting Dr. Franciosi's opinions. Now, you may say that there were some of these qualifying statements by the hospital's counsel, and that is in the record. But you also have to look at the substance, and in substance Dr. Coffman refuted every single opinion that the plaintiffs take issue with today. And I reread all the briefs again, and there is not one opinion that Dr. Coffman didn't refute. There's not one item of substance that the plaintiff has identified that was raised by Dr. Franciosi in his evidence deposition that wasn't covered in his discovery deposition. So again, perfect? No. Error? I don't think so. And certainly not prejudicial error. And I think, you know, when you consider the attention that the trial judge gave to this issue, it's not a situation as often is the case where an expert blurts out an undisclosed opinion at trial. And so the jury hears the undisclosed opinion before there can be an objection, before the judge gets a chance to rule on it. The trial judge here wanted to very carefully look at this issue after the plaintiffs raised it in motions and limine. So after the evidence deposition was taken, rather than just try to address the issue quickly, or the trial judge conducted a special Saturday session at our offices, he devoted quite a bit of time to going through the deposition line by line, discovery deposition compared to evidence deposition. And his conclusion was there wasn't anything that was in the evidence deposition that hadn't been covered in the discovery deposition. So on that basis, I would have to submit that the trial judge clearly acted within his discretion in making the ruling that there was no Rule 213 violation. I'm sorry, Your Honor? Oh, thank you, Your Honor. One more point I'd like to raise on the Franciosi issue, and that is the issue of these blowups. There was never an objection to those exhibits. Not an objection when the exhibits were put up, when Dr. Franciosi's evidence deposition was played for the jury. That's at volume 19, page 103. No objection, not when it was moved into evidence, not when all of those exhibits were moved into evidence. For the plaintiff to argue to this court that a blowup of a slide that is a placental slide somehow could have scared the jury into a not guilty verdict, I think, doesn't make sense on this record. The trial judge did not think it made sense when he heard all of these arguments at the post-trial motion. Your Honors, unless the Court has a specific question on the literature issues, I see that my time is up, and I want to give Mr. Horstman an opportunity to address the other issues. I will thank the Court for its time and ask for affirmance. Thank you. May it please the Court, good morning. My name is Jim Horstman. I represent Dr. Laurie Anderson. I'd like to first address the 2622 issue. As has been noted, the trial judge didn't allow the defendants to make broad use of the 2622 report. Dr. Blake had given a lot of opinions as to deviations at trial that were not part of his 2622 report. We wanted to impeach by way of remission, and the trial judge said, no, you can't do that. The trial judge did allow the defendants to use the 2622 report to show contradictions, to use the 2622 report as a prior inconsistent statement and impeach Dr. Blake that way. Now, the factual nub of this dealt with Dr. Blake's readings of the fetal monitor strips. I'm sure the Court has probably seen these before, but the fetal monitor is set up as electrodes on the baby end or the mother, and that's the way they monitor the heart rate of the child. The machine spews off a strip of paper that has a continuous... Okay. That creates a continuous line drawing of the baby's heart rate and beat. Now, what was the problem with Blake? In his 2622 report, he looks at these fetal strips, fetal monitor strips, and he says, oh, what I see is variable decelerations. These are the more benign type of decelerations, more common. He said 13 times in the 2622 report, I see variable decelerations here. He gets to trial. Direct testimony, he says, looking at the same fetal monitor strips, he says, now I see late decelerations and or variable decelerations with a late component. There was another step. Yeah, on cross-examination, Dr. Blake again is asked, what do you see on these strips? And on cross-examination, he says, I see only late decelerations. Big point. Late decelerations, repetitive, continuing late decelerations are never benign. Late decelerations mean the baby isn't getting enough oxygen. So it was a fairly important point in the case. So you've got three different opinions from this physician. Three different, two of which were directly inconsistent with the 2622 report. Now, what the trial judge did is he simply allowed the defense to use the 2622 report. And we said that generically, but it was a detailed four-page letter from Dr. Blake. He simply allowed the defendants to use it the way you use any other prior inconsistent statement. The jury was entitled to know that Dr. Blake had given a radically different reading of the fetal monitor strips a couple of years before the trial. Justice Hoffman asked, well, is this a fact or is this an opinion? I think it's primarily a fact. It's the machine reading, but there's some interpretation. I think the critical point here is that Dr. Blake had those strips before him when he wrote out the 2622 report. And he was looking at those same strips at trial. And he never said, well, I've changed my reading of these because now I have a lot of additional information. No. His trial testimony is couched in what now do you see on the fetal monitor strips and looking at the same exact thing, he comes up with a different reading. I think that argument that could be made that it was indeed a preliminary letter, he hadn't had the benefit of viewing all of the discovery that was available and therefore this preliminary letter, the 6-622 report should not have been sufficient or worthy of being utilized for impeachment purposes at trial because it was simply a routine preliminary thing which physicians do prior to allowing a case to be allowed to go to trial. Dr. Blake's 2622 report says right up front that he has the medical records before him. So he had everything that he needed. Wait a minute. Does a review of medical records change the interpretation of the fetal monitor strip? I don't think so. And again, it's the same strips, the same medical records that he had when he did the 2622 report is when he was at trial. At trial, when this inconsistency was presented, he didn't say anything like, you know, my opinion changed because now I have additional information that I didn't have then. There was no effort to rehabilitate. Had the medical record, in fact, said that opinions may change after additional information is discovered throughout the process of the trial, would that have provided even more protection or not? Well, yes. I think if it was Dr. Blake's feeling that his opinion might change, 2622 doesn't prohibit a medical professional from doing that. It does not describe what form it's supposed to be in at all. In your opinion, is there a difference between if it had been an opinion or if it had been facts that the doctor testified to in this report? Your Honor, I don't. I mean, there's certainly a distinction to be made there, but here on this record where Dr. Blake had the strips and had the medical records when he did the 2622 report, he's looking at the same exact stuff at trial and gives a different opinion and at trial he's confronted with this inconsistency and he never tries to explain it. Nothing's changed. Why don't we get an opportunity to explain it rather than redirect it after you've impeached him? Right. Well, you don't expect the plaintiff to bring out the inconsistency first? No, no, no. So, that's your rub. The question becomes, was it a prior inconsistent statement? Was it? And if it's a prior inconsistent statement, can it be used for purpose of impeachment? And you say it makes no difference. You don't think it makes a difference whether it's an opinion or it's a fact. But opinions change based on totality of circumstance. A fact is a fact. And it doesn't change based on totality of circumstance. Either the thing says it or it doesn't. So it occurs to me that this arises or falls on the question of whether this interpretation of this strip is a fact that a doctor testifies to. That strip says this. Or it doesn't say this. As opposed to, in my opinion, the strip coupled with this, coupled with that, coupled with the other thing tells me that the child was in some form of stress. I think it's a combination. It's primarily fact because you have the tracings there. I keep coming back to the point that on this record, I think it doesn't matter because nothing did change. The hypothetical doesn't apply here. He had the same materials before him at both times and he never said that now I have new information, that's why I'm changing my reading or my opinion. What if he had said that? What does that do? Other than attempting to rehabilitate his impeachment. It doesn't do a thing. It doesn't warrant an obstruction to the jury that they're to disregard the inconsistency. No, it's fair play. It's a prior inconsistent statement to get an opportunity to rehabilitate. So I'm suggesting to you it's irrelevant whether he said I changed my opinion or he didn't. The question becomes, is it inconsistent? And is it a fact? Yes, I think I was anticipating somewhat counsel's comment that he thought that there was some unfairness in this process. I think there's no unfairness. Dr. Blake could have explained why his opinions at trial or his readings of the scripts were inconsistent. He didn't. He never said that there was anything else. Another point to be made, a couple quickly. On the legal aspect of this, plaintiff admits there is no case that says it's improper to use a 2622 report for purposes of this kind of impeachment. What plaintiff is really trying to do is get this court to create a new rule, something that is not in 2622. If the legislature had wanted to limit the use of this, it could have done what other states have done. Put it in the statute. Can't be used at trial. Legislature hasn't done that. Supreme Court hasn't done that. The trial court's ruling is consistent with 2622. That is to avoid or prevent or discourage frivolous lawsuits. If a medical professional writing a 2622 report knows that he can be impeached with this, he's going to be careful. The whole process will have more integrity. There's no unfairness because he can always explain what the problem was. I do want to direct the court's attention to the harmless error aspect of this. On this record, I want to point the court to plaintiff's closing argument where he told the jury no fewer than seven times, don't worry about Blake. I don't need Blake. You can disregard Blake. I can prove my case without Blake. I think you'll be surprised how directly and unequivocally he told the jury, don't worry about Blake. We cite this in our brief, but it's volume 20, pages 174 to 185. Plaintiff's attorney is telling the jury that they can totally disregard Blake, yet he comes before this court and says because there were problems with the cross-examination of Blake, this court should reverse the judgment. It doesn't hold up. On the waiver aspect of the issue, I want to point out that the plaintiff himself used and referred to a blow-up of the cross-examination of Blake. This is in our brief, but volume 18, pages 13 and 14, the plaintiff himself was making reference to the report. And with reference to his complaints of comments of closing argument, he says that repeatedly defense counsel called Dr. Blake a flopper or a flounder. And I think he says how many times these comments were made. Not one objection, Your Honor. Not one single objection to those comments of closing argument. Thank you, Your Honor. We ask for affordance of the judgment. Thank you. Mr. Pritchard. Mr. Pritchard, I have two questions for you. Did Dr. Kaufman offer testimony contrary to each of the opinions that Dr. Franciosi gave? No. Causation opinions? No. What he offered was, in my opinion, but it happens to be true, this is Kaufman, what he said was those other changes that are in there, they're found in something like 10% of all placentas without any problem. He didn't offer any opinion as to whether that did or did not cause fetal brain damage, because he could not. Which dovetails into our medical literature, because then they get up on the stand and start impeaching him with medical literature on cytokines, and he's like, I don't know that. What do you mean you don't know that? It all ties together. The next question I have for you is, I asked a question before on this offer of proof business, and I found it in that brief. It indicated on page 54 that you failed to make an offer of proof on the issue, and therefore the issue hadn't been preserved. It's the last two lines in page 54 of the brief. Now, what did the trial judge have in front of him? Which issue? Hibbs? On Hibbs. The trial judge had on at least three hearings on this the evidence deposition transcript of Hibbs and the discovery deposition of Hibbs. And the testimony of Hibbs that's contained within those depositions is her interpretation of the fetal brain strips? Yeah, it's her qualifications, and then she says this shows fetal intolerance to labor, and we crossed that out of the transcript and then read the transcript in. So it was a simultaneous offer of proof. So the trial judge knew well what she would have testified to? He knew exactly word for word. Very quickly, I got this tuition rule a day ago. I'm reading it last night and I'm like, whoa, this is something really serious here. I took a look at the history. In 1970 in Moore v. Jewelty, we adopted it for two counts. Then we go on to Strinno who adopts it for jury instructions. And then they give us this case that just came down that says, well, it's dicta. But it seems to say, well, any time you have two issues, if you haven't had a special interrogatory, you're out of your luck on appeal. I have two points on that. Do we really want to do that? That means we're going to have to have special interrogatories on every single medical malpractice case because there's always going to be causation and violation of standard of care. And the literature is rife with articles saying, don't use these. These create more error than anything else. Point number two, if that's the interpretation, how do you justify all of the 213 cases that this first district has reversed just because an extra opinion was put in by the defense attorney and Clayton cases before you, which cites Regala, which is exactly the same cases we have here with the baby. They reversed that. No mention of that. Anyhow, I want to briefly address what they just came up with. They talk about 2-622 and you're creating policy. Yeah, it's a bold move for a first district court to say you can't use this for cross-examination. It's going to be the first time in the state. I get it. It's a bold move. I think there's policy reasons why you should do it. By your questions, maybe you don't. But you don't even have to reach that. You only have to reach that this is an opinion. They want to have it both ways. They want to keep Hibbs' testimony out and Nicholson's testimony out because when they're reading the strip, it's an opinion. But when Blake reads the strip, they want it to be a fact. Well, which is it? These are preliminary opinions. It says at the top of the disclosure. These are the opinions he's going to have at trial. They're not facts. They're opinions. Okay, I'm concluding. Give us a new trial. They can have Franciosi. They can put him in to say all this stuff. We'll be able to take his discovery deposition. We'll be able to get an expert to counter him. Just give us a fair playing field and we'll win this case. That's all we're asking. That was overwhelming, terrible gamesmanship error.